Norfolk

PATRICK LESTER KELLY

v.

COMMONWEALTH OF VIRGINIA

No. 1296-86-1

Decided July 11, 1989

COUNSEL

Mark L. Earley (Tavass, Fletcher & Earley, on brief), for appellant.

James L. Chin, Assistant Attorney General (Mary Sue Terry, Attorney General; Leah H. Darron, Assistant Attorney General, on brief), for appellee.

362

OPINION

**HODGES, J.**—Patrick Lester Kelly (appellant) was convicted by a jury of the first degree murder of his wife, Margaret Brown Kelly. He was sentenced in accordance with the jury's recommendation to life imprisonment. On appeal, Kelly raises the following issues: (1) whether his confession was obtained in violation of his sixth amendment right to counsel and, therefore, should have been suppressed; (2) whether his confession was involuntary and, therefore, should have been suppressed; (3) whether the trial court erred by admitting highly inflammatory evidence of three prior assaults by him against his wife; (4) whether the trial court erred by admitting into evidence highly inflammatory photographs of the victim; (5) whether the trial court deprived him of his fourteenth amendment due process right by granting jury instruction number nine which informed the jury that it "may infer that every person intends the natural and probable consequences of his acts;" and (6) whether the trial court erred in failing to set aside the verdict as being contrary to the law and evidence. For the reasons set forth below, we reverse in part and affirm in part. Because the proceeding must be remanded for a new trial, we do not address the question of the sufficiency of the evidence.

## I. FACTS

On Saturday, August 17, 1985, Kelly, who was in jail on a charge of maliciously wounding his wife on June 29, 1985, was released on bond on the condition that he have no contact with his wife until after his trial. C. W. Megginson, who posted bond for Kelly, dropped him off at Southland Corporation about a half mile from his home between 8:45 p.m. and 8:50 p.m. Kelly purchased two pints of liquor at a nearby North Carolina liquor store a few minutes before 9:00 p.m. He told the McHorneys who worked there that he had spoken to his wife earlier and she agreed to put his clothes and tools in the car. He said he was going home that night to pick up his things and then he was going to a friend's house in Virginia Beach to spend the night. Kelly learned from the McHorneys that his wife had bought some liquor there earlier with someone else. Margie Elings, a friend, testified that Kelly called her that evening to find out where his wife was. He told Elings, "I'll find her, I'll kill her."

Around 2:00 p.m. the next day, Russell Hastings saw Kelly. He noticed a dark stain on Kelly's shirt near the shoulder. Kathleen McCullen also saw Kelly on Sunday. She observed blood on his shirt, hand, and cheek and thought he smelled like his wife's house, which always smelled like animals. After Kelly left McCullen, he went to the Cox's home. They also observed blood on his shirt. Kelly showered and borrowed clean clothes and tennis shoes from them. He ripped up his shirt and threw it in the garbage, but left behind his boots and pants. Kelly told Mr. Cox that his wife had testified against him and that if he found her, he was going to "hurt" her. He also left his car keys with Mrs. Cox and told her not to give them to anybody and to "get rid of them" if he did not return for them in a couple of days. The Cox's drove Kelly to a bar and left him there at 7:30 p.m.

The next morning, Monday, August 19, 1985, at 10:00 a.m., Kelly bought two pints of liquor from Mr. Williams at the same liquor store. Kelly asked to speak privately with Williams. He told Williams that he had gone home that morning and found his wife's dead body, which the dogs were eating. When Kelly left, Williams advised the Sheriff of Currituck County, North Carolina, who dispatched a deputy to the Kelly home and notified Chesapeake authorities. Officers went to the home, but, finding nothing amiss, left. There was loud music playing in the house and dogs came to the windows. Subsequently, Deputy Brinkley found the defendant lying on the railroad tracks behind Southland Corporation and notified the Chesapeake police. Kelly told Deputy Brinkley and Officer Fischetti that he was worried about his wife because he had been to her house and her car was gone and she was not there but loud music was playing. He later changed his story and said that he had not been by the house because the judge told him to stay away.

Kelly accompanied Officers Corriveau and Fischetti and Brinkley to his wife's home to get his clothes and tools. Officer Fischetti called for Mrs. Kelly, but received no answer. Kelly approached the house and removed the screen from an open front window. When he did, several dogs exited, causing him to step back. The police ordered Kelly to stay away from the house. Officer Fischetti looked into the house through another window and observed part of a body on the floor. He then stood on something and looked through the screenless open window and observed Mrs.

Kelly's body sprawled on the living room floor.

When Officer Fischetti approached the front door, Kelly began screaming that his wife had been raped and was dead. Officer Fischetti entered the house and determined that Mrs. Kelly was dead.[1] The defendant became disorderly and was arrested. At 5:03 p.m., Kelly was advised of his rights and elected to waive them. Detective Griggs questioned Kelly, but Kelly disclaimed involvement in his wife's death. When questioned later in the evening, he again denied involvement. However, the next afternoon on August 20, 1985, after initially denying involvement, Kelly confessed to Detective Griggs that he killed his wife. He claimed that he went home Friday evening to get his clothes and fell asleep on the couch. When his wife came home after midnight and found him sleeping on the couch, she went into a rage and tried to throw a liquor bottle at him. He admitted hitting her numerous times with his fist, but said he could not remember if he kicked her or hit her with anything else. When she stopped moving, he was scared. He had been drinking earlier. He stated that he awakened the next morning and found her dead. He returned to the house later and spent Sunday night in the house. Monday morning he saw that the dogs had eaten her arm. He said that he loved his wife and did not mean to kill her. Later that same day, Kelly also called Lyle Cox and admitted killing his wife.

## II. SIXTH AMENDMENT RIGHT TO COUNSEL

On appeal, Kelly contends that the trial court erred in admitting his confession into evidence because it was obtained in violation of his sixth amendment right to counsel. Relying on *Michigan v. Jackson*, 475 U.S. 625 (1986),[2] Kelly asserts that his sixth amendment right to counsel attached at his initial appearance in juvenile and domestic relations court on the morning of August 20, at which time he requested the appointment of counsel. A few hours later, before he had spoken to counsel, the police initiated

---

[1] Dr. Faruk Presswalla, the medical examiner who described the numerous injuries on the victim's body, determined the cause of death to be multiple blows to the head which fractured the skull causing contusions of the brain and rupture of the brain tissue. He estimated that she died between midnight on Saturday, August 17, 1985, and 10:00 a.m. on Sunday, August 18, 1985.

[2] *Jackson* was decided by the Supreme Court on April 1, 1986, between the date of Kelly's confession and the July 2, 1986 suppression hearing on the matter.

questioning of him and obtained his confession. Although Kelly waived his rights prior to confessing, *Jackson* renders invalid any waiver of the defendant's right to counsel for a police-initiated interrogation after his assertion of his right to counsel at an arraignment or similar proceeding. *Id.* at 636. The Commonwealth, however, argues that Kelly's sixth amendment right to counsel was not violated because his right had not attached when he made his statement. *See Hunter v. Commonwealth*, 3 Va. App. 221, 225, 349 S.E.2d 154, 156 (1986) (issuance of an arrest warrant and the accused's arrest does not trigger the sixth amendment right to counsel).

Although the transcript of the July 2, 1986 suppression hearing was filed late and, therefore, cannot be considered under Rule 5A:8 of the Rules of the Supreme Court of Virginia, we will proceed under the authority of *Turner v. Commonwealth*, 2 Va. App. 96, 341 S.E.2d 400 (1986), to decide whether the *Jackson* ruling applies in this case. "If the record on appeal is sufficient in the absence of the transcript to determine the merits of the appellant's allegations, we are free to proceed to hear the case." *Id.* at 99, 341 S.E.2d at 402. The court's letter opinion of July 22, 1986, regarding the suppression issue, which is part of the record, reflects that the Commonwealth conceded that the *Jackson* rule, if applied retroactively, would require suppression of Kelly's August 20th statement. In overruling the motion to suppress, the court ruled that *Jackson* should only be applied prospectively. Because the Commonwealth conceded that the *Jackson* ruling, if applied here, would result in suppression of Kelly's statement, the only issue before the court at the suppression hearing was whether *Jackson* applied. It is likewise the only issue before this court on appeal.

On appeal, Kelly contends that the *Jackson* ruling clearly applies in this case because *Jackson* was handed down before the suppression hearing on the issue and most importantly before his trial and conviction. The Attorney General on appeal concedes this also. Arguing, however, that it is not bound by the concession of the Commonwealth's Attorney at the suppression hearing, the Commonwealth contends that Kelly's sixth amendment right to counsel had not attached when the police initiated questioning of him and obtained his confession. The Commonwealth contends that Kelly's initial appearance before a clerk of the Chesapeake

Juvenile and Domestic Relations Court did not ammount to an adversarial judicial proceeding.[3] Therefore, *Jackson* does not hold Kelly's waiver of his right to counsel invalid because his sixth amendment right to counsel had not attached at the time. Thus, the Commonwealth on appeal contends that the court's denial of the motion to suppress was correct for the wrong reason. We disagree.

■ Initially, we hold that the Commonwealth is bound by the Commonwealth's Attorney's concession at the suppression hearing. In doing so, we distinguish *In re Department of Corrections*, 222 Va. 454, 281 S.E.2d 857 (1981), relied upon by the Commonwealth. In that case, the Commonwealth's Attorney saw and approved an order of the circuit court which was entered more than twenty-one days after the entry of the sentencing order. The order, which released three prisoners from the penitentiary, suspended their sentences, and placed them on probation, was entered at a time when the court lacked jurisdiction. The supreme court held:

> The Commonwealth's Attorney, the only official legal representative of the Commonwealth in the trial court, acquiesced in the procedure that the Attorney General now attacks. Nevertheless, the Commonwealth may not be estopped from repudiating the earlier position erroneously taken by the Commonwealth's Attorney, nor may the Department be estopped from changing its position. . . . Furthermore, once the trial court actually lost jurisdiction over the cases by the passage of time, such jurisdiction could not be reconferred by the Commonwealth's acquiescence in any attempted exercise of jurisdiction.

*Id.* at 465, 281 S.E.2d at 863 (citations omitted). Webster defines "acquiesce" in this context as "to accept or comply tacitly or passively: accept as inevitable or indisputable." *Webster's Third New International Dictionary* 18 (1981). Webster defines "concede" in

---

[3] Kelly testified at the July 2, 1986 suppression hearing that after the issuance of the arrest warrant, he was taken before a clerk of the Chesapeake Juvenile and Domestic Relations Court who informed him of the charge and asked him if he understood the charge and whether he could afford an attorney. He responded that he was indigent and requested an attorney. Kelly was informed that Richard Kreger had been appointed to represent him and he was returned to jail.

this context as "[a]dmit, [a]cknowledge . . . to accept as true or accurate . . . to acknowledge grudgingly or hesitantly . . . to acknowledge as won by an opponent without formal determination of the result." *Id.* at 469. Unlike this case, the Commonwealth's acquiescence in the court's order in *Department of Corrections* clearly did not amount to a concession on a legal point which eliminated the matter as an issue in controversy before the court. In fact, in *Department of Corrections*, when the Commonwealth acquiesced in the procedure, the jurisdiction of the court was not at issue. On the other hand, the Commonwealth in this case conceded a legal point that was at issue in a proceeding before the court to determine the matter. The concession negated the issue. Therefore, we find that *Department of Corrections* is inapposite here.

■ Furthermore, Rule 5A:18 bars the Commonwealth on appeal from raising an issue it conceded at the suppression hearing. An issue that was not in dispute below will not be considered for the first time on appeal. *Green v. Warwick Plumbing & Heating Corp.*, 5 Va. App. 409, 412-13, 364 S.E.2d 4, 6 (1988); Rule 5A:18. To hold otherwise would defeat the purpose of Rule 5A:18.

Rule 5A:18 serves an important function during the conduct of a trial. It places the parties on notice that they must give the trial court the first opportunity to rule on disputed evidentiary and procedural questions. The purpose of this rule is to allow correction of an error if possible during the trial, thereby avoiding the necessity of mistrials and reversals. To hold otherwise would invite parties to remain silent at trial, possibly resulting in the trial court committing needless error.

*Gardner v. Commonwealth*, 3 Va. App. 418, 423, 350 S.E.2d 229, 232 (1986); *see also Simmons v. Commonwealth*, 6 Va. App. 445, 450, 371 S.E.2d 7, 10 (1988).

■ Next, we find that *Jackson* is applicable. We agree with Kelly and the Commonwealth on appeal that the applicability of *Jackson* to this case is clear. The Attorney General conceded the applicability of *Jackson* at oral argument. *Jackson* was decided before Kelly's trial and conviction, so it clearly applies. *Griffith v.*

*Kentucky*, 479 U.S. 314 (1987),[4] however, removes any doubt as to the applicability of *Jackson* in this case. The Supreme Court held: "[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Id.* at 328.

■ Finding that *Jackson* applies and that Kelly's sixth amendment right to counsel had attached when the police initiated their interrogation which resulted in his confession, we hold that Kelly's confession was improperly obtained and should have been suppressed. "[I]f police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Jackson*, 475 U.S. at 636. It is undisputed here that the police initiated questioning of Kelly after his appearance in Juvenile and Domestic Relations Court and before he saw his counsel.

■ Additionally, we find that the admission of Kelly's August 20th confession was reversible error. In doing so, we reject the Commonwealth's argument that Kelly's confession to Lyle Cox on the evening of August 20, 1985, combined with the other evidence presented at trial, renders any error harmless. Kelly, however, argues that the confession was the "centerpiece" of the Commonwealth's case and the "glue" that tied the rest of the evidence together. While the admission of a confession obtained in violation of the defendant's sixth amendment right to counsel is subject to the harmless error analysis, *see Milton v. Wainwright*, 407 U.S. 371 (1972), we are unable to conclude that the admission of the confession was harmless beyond a reasonable doubt. "Error [is] presumed to be prejudicial unless it plainly appears that it could not have affected the result." *Sargent v. Commonwealth*, 5 Va. App. 143, 155, 360 S.E.2d 895, 902 (1987). Here, because the remainder of the evidence against Kelly was circumstantial, we cannot say that the admission of the confession could not have

---

[4] *Griffith* was decided by the Supreme Court on January 13, 1987, after Kelly's conviction.

affected the result.

## III. VOLUNTARINESS OF THE CONFESSION

Because we find that Kelly's confession was obtained in violation of his sixth amendment right to counsel and its admission into evidence was reversible error, we need not determine whether Kelly's confession was voluntary.

## IV. EVIDENCE OF PRIOR ASSAULTS

Over Kelly's objection that its prejudicial effect outweighed its relevancy, the court allowed the Commonwealth to present evidence through a number of witnesses regarding three prior assaults by Kelly against the victim. The first incident occurred on November 1, 1984, when Kelly stabbed and beat his wife and threatened to kill her. As a result, she was hospitalized and he was arrested for felonious assault. The second incident occurred on May 31, 1985, when Kelly beat his wife with a frying pan. Responding to a call, the police found the victim badly bruised and her forehead and right forearm were swollen. The police arrested Kelly, who was intoxicated, for a misdemeanor assault. The third incident occurred on June 29, 1985, when Kelly beat his wife with a broom handle. Officer McClenney, who responded to the call, testified that Kelly told him he had beat his wife with a mop handle. Kelly also told Officer McClenney that "[i]n North Carolina you can beat your wife as long as it is eighteen long, in reference to a stick. I thought I could get away with it here." When Officer McClenney found the victim, she was bleeding from a two-inch gash in her head, both nostrils, and a laceration on her nose. In addition, he observed a lump on her head, welts and bruises on her legs and arms, and the middle finger on each hand was noticeably discolored and swollen. Officer McClenney also described finding splattered red stains on some of the walls and furniture and five pieces of a broken broom handle in the room where the assault occurred. Kelly was arrested and charged with felonious assault.

On August 8, 1985, within two weeks of her death, the victim testified against her husband on the May 1985 misdemeanor assault charge in Chesapeake's Juvenile and Domestic Relations Court. The defendant was convicted of that charge. Mrs. Kelly also testified on the same day at the preliminary hearing on the

June 1985 felonious assault charge. When asked by the Commonwealth at trial whether Kelly ever commented about his wife testifying against him, Lyle Cox, a friend of Kelly, responded that Kelly "said that if he ever went to jail over anything like that, that when he got out he would hurt her." Also, Lyle's wife, Lela, testified that Kelly told her after the November 1984 assault that he "should have killed [his wife] and buried her body in back and nobody would ever find her."

On August 17, 1985, after serving fifty-one days for assaulting his wife, Kelly was released on bond from jail. He was ordered by the court not to go near his wife until after the June 1985 assault charge was tried.

In ruling on the admissibility of the evidence of the prior assaults, the trial court explained that the evidence was admissible to establish "the relationship between the parties and the motivation, intent, malice with which the defendant acted in this specific case." While conceding on appeal that evidence of any or all three of the assaults may have been admissible for this purpose without the repetitiveness and explicitness that was allowed at trial, Kelly contends that the admission of the evidence of the three prior assaults constitutes reversible error because the cumulative prejudicial effect of the evidence on the jury outweighed its probative value. We disagree. Finding no error, we affirm the trial court's ruling.

■ "It is well settled in this state, and generally, that on the trial of a defendant for a specific offense, it is usually improper to admit evidence against him of a prior independent crime." *Roy v. Commonwealth*, 191 Va. 722, 726, 62 S.E.2d 902, 903 (1951).

However, "[e]vidence of other offenses is [admissible] if it shows the conduct and feeling of the accused towards his victim, if it establishes their prior relations, or if it tends to prove any relevant element of the offense charged. Such evidence is permissible in cases where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with or leads up to the offense for which the accused is on trial." *Foster v. Commonwealth*, 6 Va. App. 313, 323, 369 S.E.2d 688, 694 (1988) (quoting *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272, 176 S.E.2d 802, 805

(1970)). If the evidence tends to prove a material issue or element of the crime and the trial court finds that the probative value of the evidence outweighs any prejudicial effect it will have on the jury, the trial court may in its discretion properly admit the evidence.

*Callahan v. Commonwealth*, 8 Va. App. 135, 141, 379 S.E.2d 476, 479 (1989). The court, however, must properly instruct the jury of the limited purpose for which the evidence can be considered. *Id.* at 141-42, 379 S.E.2d at 480.

■ Since the evidence showed a past course of violence by Kelly against his wife and a motive for her killing and since the trial court properly instructed the jury as to the limited purpose of the evidence,[5] we find no abuse of discretion by the trial court. All three assaults occurred within one year of the victim's death. Furthermore, we find that the evidence as a whole was neither repetitive nor unduly explicit. " 'Cumulative [evidence] is repetitive [evidence] that restates what has been said already and adds nothing to it. It is [evidence] of the same kind and character as that already given.' " *Cash v. Commonwealth*, 5 Va. App. 506, 512, 364 S.E.2d 769, 772 (1988) (quoting *Massey v. Commonwealth*, 230 Va. 436, 442, 337 S.E.2d 754, 758 (1985)).

## V. ADMISSIBILITY OF PHOTOGRAPHS

Kelly contends that the trial court erred in admitting inflammatory photographs of the victim's body revealing graphic and shocking injuries, some of which were the result of post-mortem animal activity rather than criminal activity. Arguing that all of the photographs were admissible to show malice on the part of the defendant, the Commonwealth claims that their probative value outweighs any prejudicial effect. Upon review, we find that the court properly admitted the photographs of the victim which depicted wounds inflicted solely by criminal activity, but committed error by admitting a graphic photograph of the victim's wounds

---

[5] Instruction 17 provides:
The Court instructs the jury that any evidence of prior offenses which may have been committed against the victim by the accused are not to be considered by you as indicating that it is likely the defendant is guilty of the offense for which he is on trial simply because of the nature of any such conduct toward the victim but may be considered with respect to the offense for which the accused is currently on trial only as such evidence may bear upon the questions of malice, motive and intent.

(Commonwealth's Exhibit #5) which also showed the victim's right arm where the bones were exposed as a result of the family dogs eating part of her flesh. However, we find the error to be harmless in this case.

 " '[T]he admissibility of photographs depicting the body of a murder victim is a matter within the sound discretion of the trial court.' " *Boggs v. Commonwealth*, 229 Va. 501, 518, 331 S.E.2d 407, 419 (1985) (quoting *Jones v. Commonwealth*, 228 Va. 427, 450, 323 S.E.2d 554, 566-67 (1984) (citations omitted)). As such, the trial court's ruling will not be disturbed on appeal absent a clear abuse of discretion. "If photographs are 'relevant and material to establish premeditation and malice and to show the degree of atrociousness of the crime,' their admission does not constitute an abuse of discretion." *Stockton v. Commonwealth*, 227 Va. 124, 144, 314 S.E.2d 371, 384 (1984) (citations omitted). "If a photograph accurately portrays the scene created by a criminal in the commission of the offense on trial, it is not rendered inadmissible merely because it is 'gruesome' or shocking." *Washington v. Commonwealth*, 228 Va. 535, 551, 323 S.E.2d 577, 588 (1984).

Therefore, while the pictures depicting the victim's wounds which were inflicted by criminal means are both gruesome and shocking, they are admissible because they are probative on the issue of malice.[6] "One who creates such a scene may not complain if an accurate depiction of his handiwork later confronts him in court." *Id.* However, because the injury to the victim's arm was inflicted by animals after the victim's death instead of by criminal activity, the photograph showing her arm is not probative on the issue of malice. The malice required in a murder conviction is "malice aforethought." *Jackson v. Virginia*, 443 U.S. 307 (1979). Furthermore, because the defendant did not inflict the wound in question, the photograph does not accurately depict the crime scene. Having viewed the highly inflammatory photograph, we

---

[6] The following is a summary of the victim's injuries: in the head region, there were twelve lacerations, bruising about the face, fractures of the bone and base of the skull, bruising on the brain, and a broken nose; in the trunk region, there were multiple bruises and abrasions, a fractured rib, and a bruised lung; on the extremities, there were multiple bruises, some fracturing of bones, and abrasions. The medical examiner testified that the injuries were consistent with impact from a blunt object or blunt surface and the toe of a shoe and a fist.

find its prejudicial effect outweighs any probative value. Therefore, the trial court abused its discretion in admitting the photograph. In so ruling, however, we recognize that the trial court retains its discretion to admit photographs of a victim which are not an exact depiction of how the victim looked at the time of the offense because of life-saving procedures or decomposition or criminal activity, provided the differences are "sufficiently explained to avoid distortion of the scene or confusion to the jury" and the prejudicial effect of the photographs does not outweigh their probative value. *See id.* at 552, 323 S.E.2d at 588.

Having ruled that the admission of the photograph was error, we find the error to be harmless in this case in light of the gruesome and shocking wounds which were inflicted by criminal means and depicted in the properly admitted photographs. Also, the medical examiner testified at trial that the injury to the victim's arm was the result of post-mortem animal activity instead of criminal activity.

## VI. JURY INSTRUCTION

At trial, the court instructed the jury as follows: "The Court instructs the jury that you may infer that every person intends the natural and probable consequences of his acts." Relying on *Sandstrom v. Montana*, 442 U.S. 510 (1979),[7] Kelly argues that this instruction deprived him of his fourteenth amendment due process right because a reasonable jury could have viewed the inference either as conclusive or as shifting the burden of persuasion to the defendant. We, however, find no merit in this argument.[8]

The instruction in this case employs the "may infer" language of Instruction No. 2.600[9] of Virginia Model Jury Instructions, which is distinguishable from the objectionable lan-

---

[7] The trial court in *Sandstrom* instructed the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." 442 U.S. at 513. Holding that the challenged instruction had the effect of relieving the State of the burden of proof on the issue of the defendant's state of mind, the Supreme Court found that the instruction was unconstitutional. *Id.* at 521.

[8] While Rule 5A:18 of the Rules of Court bars Kelly from raising this issue on appeal since the record does not reflect a contemporaneous objection, we elect to address the issue on the merits because the issue may arise again upon remand.

[9] "You may infer that every person intends the natural and probable consequences of his acts."

guage in *Sandstrom*. The *Sandstrom* instruction created a mandatory presumption whereas the instruction in this case created a permissive inference. In *Francis v. Franklin*, 471 U.S. 307 (1985), the Supreme Court explained the difference.

> A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate . facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion.
>
> . . . [Mandatory] presumptions violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of an offense. . . . A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proven. . . . A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.

*Id.* at 314-15 (footnotes and citations omitted).

Like the Fourth Circuit Court of Appeals in *United States v. Love*, 767 F.2d 1052 (4th Cir. 1985), *cert. denied*, 474 U.S. 1081 (1986), where a similar instruction[10] was given, we find no error in the challenged instruction. The jury was not required to draw any inference and was also properly instructed on the element of intent and the burden of proof. The court's rationale in *Love* is equally applicable here.

> [T]he charge merely instructed the jury as to what a reasonable inference would be. The individual jurors were not required to draw any inference. Given the district court's ex-

---

[10] The challenged instruction in *Love* stated:

Now you must consider its [sic] reasonable to draw the inference and find that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. You may draw the inference that a Defendant intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any intentional act or conscious omission.

767 F.2d at 1059 n.9.

planation of both the element of intent and its instruction reflecting the government's need to prove all the elements of the alleged crimes, including intent, beyond all reasonable doubt, we believe the charge, taken as a whole, did not create a conclusive presumption regarding intent nor constitute reversible error. *See United States v. Arthur*, 544 F.2d 730 (4th Cir. 1976) ("An instruction that it is reasonable to *infer* that a person ordinarily intends the natural and probable consequences of his voluntary acts has generally been held proper.").

*Id.* at 1059-60.

Accordingly, for the foregoing reasons, we reverse the conviction and remand the proceeding for a new trial.

*Reversed and remanded.*

Baker, J., and Duff, J., concurred.