CHURCH OF THE AMERICAN KNIGHTS OF THE KU KLUX KLAN, Realm of Pennsylvania, and Kay Ryan, Plaintiffs,

v.

CITY OF ERIE, Defendant.

No. CIV.A. 98–337 ERIE.

United States District Court,
W.D. Pennsylvania.

Jan. 25, 2000.

Richard Ruth, Erie, PA, Richard Gilmore, Waterford, PA, Witold J. Walczak, ACLU of Pennsylvania, Pittsburgh, PA, for Plaintiffs.

Gregory A. Karle, Erie, PA, for Defendant.

### MEMORANDUM OPINION

McLAUGHLIN, District Judge.

On November 24, 1998, this action was commenced against the City of Erie, Pennsylvania by Plaintiffs, the Church of the American Knights of the Ku Klux Klan, Realm of Pennsylvania (hereinafter, the "Klan") and its "Grand Dragon," Kay Ryan. Plaintiffs sought a temporary restraining order and/or preliminary injunction against the City precluding enforcement of the City's "anti-mask" ordinance. Plaintiffs asserted a cause of action under 42 U.S.C. § 1983, claiming that the ordi-

nance violates their rights under the First and Fourteenth Amendments to the United States Constitution. Following a hearing on the preliminary injunction, this Court granted the Plaintiffs' motion in part. The matter is now before the Court again on consideration of Plaintiffs' request for permanent injunctive relief. We have jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). For the reasons that follow, Plaintiffs' motion for permanent injunctive relief will be granted in part and denied in part.

## I. BACKGROUND

The Klan is an unincorporated political association that advocates on behalf of the white race and the Christian faith. It was organized in 1996 and foreswears any formal affiliation with other Ku Klux Klan groups existing in the United States. Plaintiff Kay Ryan is a resident of Allegheny County, Pennsylvania and Grand Dragon of the Klan since July 1998. She represents that the purpose of her organization is to "non-violently promote white rights; racial separation; Christianity; and Americanism." (Aff. in Supp. of Verified Complaint and Mot. for Temp. Restraining Order or Preliminary Injunc. at ¶ 8.) Ms. Ryan further represents that her organization does not permit under any circumstances the performance of illegal or violent activity or the carrying of any weapon. (*Id.* at ¶¶ 9, 12.)

In early November 1998, the Klan provided officials of the City of Erie with notice of its intention to conduct a demonstration on Saturday, November 28, 1998 from 1:00 p.m. to 3:00 p.m. at the Erie County Courthouse. The purpose of the demonstration, according to Ms. Ryan, was to speak out against affirmative action, abortion, child molesters, drug dealers and homosexuals.

In response to this notice city officials advised Plaintiffs that, while the City would not prohibit the demonstration, it

intended to enforce Article 733 of its Codified Ordinances (hereinafter, "Article 733" or the "Ordinance"), which imposes criminal penalties for, *inter alia*, the concealment of an individual's identity in a public place when coupled with certain specified "intent" requirements. To that end, members of the City Council unanimously adopted a measure directing the Mayor to enforce the Ordinance if members of the Klan wore hoods during the planned demonstration.

Plaintiffs then commenced this action, claiming that the City's intent to enforce the Ordinance would violate their First Amendment rights of free speech and assembly, as well as their Fourteenth Amendment right to equal protection of the laws and their right to associational and political privacy under the First, Fourth, Ninth and Fourteenth Amendments to the United States Constitution. Furthermore, Plaintiffs argued that the Ordinance is both overly broad and impermissibly vague in that it does not adequately advise individuals of the conduct being proscribed, thereby giving City officials unfettered discretion in enforcement of the Ordinance in violation of the Fourteenth Amendment Due Process Clause. Based on these claims, Plaintiffs asked this Court to impose a temporary restraining order and/or preliminary injunction preventing the City from enforcing Article 733 against any speaker or attendee at the November 28, 1998 demonstration.

Following a hearing on Plaintiffs' motion, the Court found that Plaintiffs had shown a likelihood of success on the merits and had satisfied the other requisite elements for preliminary injunctive relief. In particular, the Court found that Plaintiffs would likely be able to demonstrate that the subject Ordinance was unconstitutionally vague, at least in part, in violation of the Fourteenth Amendment. Accordingly, the Court entered a preliminary injunction which enjoined the City from enforcing most aspects of the Ordinance [1] pending a

---

**1.** The Court did not enjoin enforcement of     that aspect of Article 733 which prohibits an

hearing on final injunctive relief. A hearing on the request for a permanent injunction was set for December 14, 1998.

At the December 14 hearing, additional testimony was taken from city officials concerning the intent and purpose of Article 733. At the close of that hearing, the Court ordered that the preliminary injunction remain in effect until a final ruling could be made on Plaintiffs' request for permanent injunctive relief. That matter is now before the Court and is ripe for disposition.

## II. DISCUSSION

Article 733 prohibits the concealment of an individual's identity in public places under certain circumstances. Section 733.02 generally provides as follows:

> **733.02 CONCEALING IDENTITY IN PUBLIC PROHIBITED**
>
> Wearing hoods which conceal the identity by hiding the face or masks in a public place[2] is hereby prohibited. No person shall, while wearing any hood which conceals the identity by hiding the face, mask or device whereby a substantial portion of the face is hidden or covered so as to conceal the identity of the wearer, enter, be or appear in any public place within the City.

Section 733.02. Certain persons are explicitly exempted from this general prohibition, including: (a) persons under sixteen years of age; (b) persons wearing a traditional holiday costume in season; (c) persons using masks in theatrical productions; (d) persons lawfully engaged in trades or employment or in a sporting activity where a mask or facial covering is worn for physical safety; (e) persons wearing a gas mask in drills, exercises or emergencies; (f) persons wearing a mask for purposes of pro-

tection against cold weather; (g) persons wearing a mask because of any illness, allergy or on the advice of a physician. Section 733.04.

Furthermore, the general prohibition applies only where the individual is wearing the hood, mask or other identity-concealing device with one or more specified "intents," *to wit:*

(a) With the intent to deprive any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of the United States or of this State or any subdivision thereof from giving or securing to all persons within this State the equal protection of the laws; or

(b) With the intent, by force or threat of force, to injure, intimidate or interfere with any person because of his exercise of any right secured by Federal, State or local laws, or to intimidate such person or any other person or any class of person from exercising any right secured by Federal, State or local law; or

(c) With the intent to intimidate, threaten, abuse or harass any other person; or

(d) With the intent to cause another person to fear for his or her personal safety, or, where it is probable that reasonable persons will be put in fear for their personal safety by the defendant's actions, with reckless disregard for such probability; or

individual from concealing his or her identity in a public place while engaging in unlawful activity with the intent of avoiding identification.

2. A "public place" is defined as "all walks, alleys, streets, boulevards, avenues, lanes, roads, highways or other ways or thorough-

fares dedicated to public use or owned or maintained by public authority; and all grounds and buildings owned, leased or operated for the use of organizations enjoying all tax-exempt privileges as charitable use." Section 733.01.

(e) While engaged in conduct prohibited by civil or criminal law, with the intent of avoiding identification.

Section 733.05.

Plaintiffs assert a facial attack on the ordinance under several theories. Primarily, they assert that the ordinance is overly broad, is unduly vague, and infringes Klan members' rights to free speech and anonymous political association. While we initially agree with Plaintiffs' assertion that their hoods are a form of protected symbolic speech, we do not agree that Article 733 enacts an unconstitutional content-based prohibition on speech.

■ Plaintiffs contend that the hoods which cover the Klan members' faces and heads constitute a form of symbolic speech which is protected by the First Amendment. At the preliminary injunction hearing, Ms. Ryan asserted that the hoods worn by her organization's members symbolically represent the members' unity as well as their "Christian humility" and "unselfish devotion to the organization." The Supreme Court has instructed that conduct may qualify as protected "speech" when there is "[a]n intent to convey a particularized message" and when "the likelihood [i]s great that the message [will] be understood by those who view[ ] it." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). We have little trouble accepting the proposition that the white hood worn by the Klan members is symbolic speech, albeit speech whose content may understandably be offensive to most citizens. At least one court has recognized that a Klan member's white robes and hoods "symbolize[ ] the Klan's beliefs and [a]re likely to be so understood by those who viewed them." *Hernandez v. Superintendent, Fredericksburg–Rappahannock Joint Security Ctr.*, 800 F.Supp. 1344, 1351 (E.D.Va.1992).[3] *See also American Knights of the Ku Klux Klan v. County of Bedford, Pennsylvania*, Civ. A. No. 97–114J at 3–4 (slip op. May 22, 1997) (Smith, J.) (anti-mask ordinance was "transparent attempt to restrict public rallies of KKK whose organization members are notorious for the hoods that are part of their regalia"; holding that anti-mask ordinance was unconstitutional "because it may be used to stifle symbolic political expression which is protected by the First Amendment") (quoting *Ku Klux Klan v. Martin Luther King Worshippers*, 735 F.Supp. 745, 751 (M.D.Tenn.1990)). This Court is satisfied that the white hoods worn by Plaintiffs' members would likely be understood by onlookers as symbolic of the Klan's identity and unity of purpose in advocating issues such as white supremacy, separation of the races, intolerance toward non-Christians, ethnic minorities and homosexuals, and the like. In fact, that point is underscored by the evidence that many citizens of Erie were deeply offended by the presence of the Klan in 1982. We can only presume that this public outcry was based on public awareness of the traditional message known to be advocated

---

**3.** The *Hernandez* court found that a detachable mask worn by Klan members was not constitutionally protected symbolic speech. In *Hernandez*, however, there was evidence that the detachable mask was not an essential part of traditional Klan regalia, but rather, an optional accessory. There was also evidence that some of Hernandez's leafleting companions had not worn the mask. The *Hernandez* court therefore concluded that the detachable mask was not itself communicative speech, since the Klan organization could fully express itself without the use of the optional mask. 800 F.Supp. at 1350–51. The court also noted that Hernandez might have been able to raise a successful First Amendment argument if he had been able to demonstrate that forced unmasking of Klan members infringed their rights to anonymous speech and free association under the First Amendment. 800 F.Supp. at 1351 n. 14.

In the present case, the evidence shows that the hoods worn by Plaintiffs are a one-piece item without a detachable mask. Thus, Klan members cannot practically comply with the Ordinance without abandoning the hood itself, which constitutes a form of communicative speech. Unlike the mask portion at issue in *Hernandez*, the hood is considered an integral part of Plaintiffs' regalia, not an optional accessory.

by various off-shoots of the Ku Klux Klan throughout history. Thus, we conclude that the wearing of hoods by Plaintiffs' members constitutes symbolic speech which is entitled to First Amendment protection.

Nevertheless, we do not consider Article 733 to be a content-based prohibition on speech. A statute that regulates speech or conduct "based on hostility—or favoritism—toward the underlying message expressed" is content based. *R.A.V. v. St. Paul,* 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). When the state uses a "content-based" regulation to restrict free expression, particularly political speech, that regulation is subject to "the most exacting scrutiny." *Bartnicki v. Vopper,* 200 F.3d 109, 121 (3d Cir.1999) (quoting *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (en banc); *Phillips v. Borough of Keyport,* 107 F.3d 164, 172 (3d Cir.1997) (en banc)). It will not be upheld unless the state can show that it "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* (citations omitted).

■ Here, Article 733 does not restrict speech *per se,* but only the wearing of a mask in certain circumstances. Some masks (like Plaintiffs' hoods) may communicate a particularized message, while other, more generic masks—which are also facially subject to the Ordinance's proscription—clearly do not communicate any particularized message. Therefore, Article 733 is not facially unconstitutional as a content-based restriction on speech, although it may impact to some extent on certain forms of protected symbolic speech.[4]

Because the Ordinance potentially impacts on protected speech, we next consider whether Article 733 is unconstitutional as overly broad and/or unduly vague. An imprecise law can be attacked on its face under either of these two doctrines. The overbreadth doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 1857, 144 L.Ed.2d 67 (1999). Furthermore, "even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *Id.* Since Article 733's anti-mask provision only applies when coupled with the "intent" requirements specified in § 733.05(a)-(e), we consider each specific context individually.

4. The evidence of record suggests that Article 733 was specifically enacted out of a desire on the part of city officials to prevent the Ku Klux Klan, or any of its off-shoot groups from demonstrating or establishing a presence in the City of Erie. There was no evidence to suggest that Article 733 has been or would ever be enforced as against other groups. Nevertheless, we understand Plaintiffs to be raising a facial challenge to the Ordinance, as opposed to challenging the Ordinance "as applied" to their particular conduct. Thus, the legislative intent behind the passing of the Ordinance is not dispositive. Nor is it relevant whether the Ordinance has been, or would be, applied in a discriminatory fashion.

To the extent Plaintiffs are asserting a challenge to Article 733 "as applied" to them, we conclude that, with the possible exception of § 733.05(c), none of the specified "intent" requirements would facially apply to the type of conduct engaged in by Plaintiffs during their November 1998 demonstration. Thus, any attempt by the City to enforce the mask prohibition against Klan members under § 733.05(a), (b), (d) or (e) would result in a finding by this Court that those provisions are unconstitutionally vague in their application, because that precise application could not reasonably be anticipated by Klan members. For the reasons set forth below, we find subsection (c) to be facially unconstitutional. To the extent the City would have attempted to enforce the mask prohibition against Klan members under § 733.05(c), such an enforcement would be unconstitutional as applied, because it clearly would have infringed on Plaintiffs' free speech rights.

*Section 733.05(a)*

Under § 733.05(a), a person is prohibited from wearing a mask in public when the person has the intent to deprive other persons of the equal protection of the laws or to prevent or hinder the constituted authorities from providing equal protection of the laws to others. "Intent" is commonly defined as "[a] state of mind in which a person seeks to accomplish a given result through a course of action." BLACK'S LAW DICTIONARY 810 (6th ed.1990). *See also* 18 PA.C.S.A § 302(b)(1)(i) (West 1998) ("A person acts intentionally with respect to a material element of an offense when[,] if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result."). Thus, the mask-wearer must have a state of mind where he/she intends to deprive others of their equal rights under the law, or intends to prevent the authorities from securing equal protection of the laws to others. Since wearing the mask alone cannot accomplish these ends, the Ordinance evidently contemplates that the offender will make an affirmative attempt—i.e., engage in some sort of conduct—to deprive others of their rights, etc., while wearing the mask.[5]

■ Given this construction of § 733.05(a), we do not consider the provision overbroad in terms of its potential infringement on protected speech. To the extent that members of Plaintiffs' association or any other Klan group would intend to engage in the activity described in § 733.05(a),[6] it is questionable whether the communicative aspect of their hoods could still be considered protective symbolic speech. Under such circumstances, the message of the Klan members would surely be clear enough from the conduct itself, and any legitimately communicative aspect of the hood would be relatively diminished. Thus, in practical terms the infringement of First Amendment rights, if any, that would result from application of § 733.05(a) is slight, particularly when viewed in light of the provision's "legitimate sweep." The underlying conduct which might constitute interfering with another person's right to equal protection under the law is conduct which undoubtedly can be, and is, legitimately proscribed by the operation of various civil and criminal statutes. *See, e.g.,* 42 U.S.C. § 1985(3) (conspiracy to interfere with civil rights); 18 PA.C.S.A. §§ 2706 (terroristic threats) 2709 harassment and stalking, 2710 (ethnic intimidation). Moreover, there may be legitimate reasons why the government might prohibit the wearing of a mask in the context of such activity: e.g., to mitigate any additional intimidation or alarm which victims or witnesses might otherwise suffer at the hands of an unknown aggressor and/or to enhance the public's ability to identify the offender, perhaps thereby discouraging such activity from occurring in the first place. In sum, any infringement of First Amendment rights that could possibly occur in the context of Subsection (a) is not sufficiently substantial so as to render § 733.05(a) unconstitutionally overbroad.

■ We also conclude that § 733.05(a) is not unconstitutionally vague. "Vague-

---

**5.** We do not construe this provision as prohibiting mask wearing with the intent to engage in the mere advocacy of political ideas, such as a repeal of the Fourteenth Amendment, that would, if accepted, result in other persons being deprived of equal protection under the law. Although a mask-wearer preaching such ideas might well intend the ultimate achievement of what he advocates, mere advocacy is not within the realm of proscribed conduct under subsection (a). Such activity would undoubtedly be considered legitimate political speech. Furthermore, the "intent" requirement of subsection (a) bespeaks an immediacy in the bringing about of the desired result (i.e., through imminent *conduct*), which cannot normally be achieved through mere advocacy of ideas.

**6.** Since Plaintiffs here foreswear any involvement with illegal activity, guns or violence, it is unlikely that this provision could ever be applied to them.

ness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Morales*, 119 S.Ct. at 1859. Applying this standard, we do not find § 733.05(a) to be impermissibly vague. The rather specific scienter requirement ensures that citizens will have adequate notice of the conduct being proscribed. In addition, it ensures that law enforcement officials will need to base their enforcement of the provision on more than the mere donning of a hood coupled with advocacy of ideas. Instead, the offender will need to demonstrate the requisite mens rea through specific speech or conduct which demonstrates an imminent intent to cause the deprivation of, or interference with, another person's rights.

▆▆ Furthermore, § 733.05(a) does not violate Plaintiffs' rights to associate freely. Plaintiffs claim that maintaining the anonymity of Klan members is necessary in order for the members to maintain their job security, their families' safety, and their own personal protection. It is alleged that, without the anonymity afforded by their hoods, many Klan members would be dissuaded from engaging in constitutionally protected activity for fear of reprisals or retribution. The Supreme Court has recognized a right to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion. *See City of Dallas v. Stanglin*, 490 U.S. 19, 24, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). However, this right does not extend to joining with others for purpose of depriving third parties of their lawful rights. *See, e.g., Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 776, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). To the extent that

§ 733.05(a) could impact the Klan members' to associate freely, it would do so only in the context of conduct that is not protected. In short, § 733.05(a)'s impact on the contact among Klan members "does not impair the First Amendment 'right of association' that the [Supreme Court's] cases have recognized." *Morales*, 119 S.Ct. at 1857.

### Sections 733.05(b) and (d)

For essentially the same reasons, we conclude that Sections 733.05(b) and (d) do not offend First Amendment or Due Process principles. Under subsection (b), a person is prohibited from concealing his identity when he has "the intent, by force or threat of force, to injury, intimidate, or interfere with any person because of his exercise of any right secured by Federal, state or local laws, or to intimidate such person or any other person or any class of person from exercising any right secured by Federal, State, or local law." Section 733.05(b). Subsection (d) applies when the mask-wearer has "the intent to cause another person to fear for his or her personal safety" or when the mask-wearer acts with "reckless disregard" of the probability that reasonable persons would be put in fear for their personal safety by the mask-wearer's actions. Section 733.05(d).

▆▆ As is true of subsection (a), both of these provisions appear to contemplate affirmative conduct on the part of the mask-wearer, above and beyond donning the mask. Furthermore, the relevant conduct is, again, conduct that could be legitimately proscribed by the government. Consequently, it is questionable whether the wearing of a Klan hood under such circumstances could convey any legitimate political message protected by the First Amendment. Assuming that the hoods could still convey some form of protected political speech, the infringement on that protected speech is not substantial when viewed in terms of the provision's "plainly legitimate sweep." Thus, subsections (b) and (d) are not facially overbroad.

These provisions also are not unconstitutionally vague. Once again, the specific scienter requirements provide the mask-wearer with adequate notice as to what conduct will cause him to run afoul of the Ordinance. In addition, the provisions are not so poorly defined as to encourage arbitrary or discriminatory enforcement on the part of police officers. Finally, application of subsections (b) and (d) would not abridge any right of legitimate association on the part of Klan members.

### Section 733.05(e)

■ We next consider § 733.05(e), which prohibits a person from wearing a mask in public while engaged in unlawful conduct, where the mask is used to avoid the wearer's identification. We conclude that this aspect of the provision does not constitute a regulation of speech at all. Rather, it prohibits mask wearing in a specific context where the mask is being used for a non-communicative purpose. In short, it regulates non-communicative conduct, not speech. Because § 733.05(e) does not infringe protected speech, it does not suffer from overbreadth. Furthermore, because the regulation does not impact on symbolic speech or any other fundamental right, its validity is determined under ordinary rational review. *See City of Dallas v. Stanglin,* 490 U.S. 19, 23, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (citing *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973))(Unless laws "create suspect classifications or impinge upon constitutionally protected rights," they need only bear "some rational relationship to a legitimate state purpose" in order to pass constitutional muster.). The regulation is plainly rational because it is reasonably fashioned to serve a legitimate governmental purpose, namely, assisting the identification of individuals who commit unlawful acts. The provision is also not vague in terms of the conduct that it proscribes. Ordinary citizens are charged with the responsibility of knowing the law, and therefore may be expected to abide by it. From a law enforcement perspective, the provision does no more than merely criminalize the concealing of one's identity during the commission of unlawful acts, which are already defined elsewhere by statute, case law, or administrative code. And, it is beyond cavil that no legitimate rights of association are implicated by the application of subsection (e). In fact, Plaintiffs do not seriously challenge the validity of this provision. We therefore conclude that Section 733.05(e) does not facially violate any constitutional right.

### Section 733.05(c)

■ On the other hand, we find § 733.05(c) to be more problematic. That provision restricts the wearing of a mask "with the intent to intimidate, threaten, abuse or harass any other person." Unlike the other "intent" provisions of § 733.05, subsection (c) can be interpreted such that an individual runs afoul of the provision simply by engaging in protected First Amendment activity while wearing a mask. Notably, the terms "intimidate," "threaten," "abuse," and "harass," are not defined in § 733.05(c). However, each of these terms, given their ordinary meaning, can be understood as encompassing forms of expression that are constitutionally protected.[7] A statement, for example, that the white race is supreme and will rise again to dominate all other races may seem intimidating, or even threatening, particularly when advocated by a large group of demonstrators showing solidarity. Advocacy for a return to segregation may likewise be intimidating, particularly if accompanied by rough language. A diatribe

---

**7.** For example, the word "intimidate" can mean, *inter alia,* "to make timid or fearful," or "frighten." *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 634 (9th Ed.1990). A "threat" can include "an expression of intention to inflict evil, injury or damage," and "threaten" can mean "to announce as intended or possible." *See id.* at 1228–29. "Abuse," can include "language that condemns or vilifies," usually unjustly, intemperately, and angrily. *See id.* at 47. To "harass" can mean "to annoy persistently." *Id.* at 552.

against a local official who is an ethnic minority, or a homosexual, may be considered "abuse." In fact, in the instant case, the mere wearing of a mask alone may constitute a violation of subsection (c) because that provision can be interpreted as criminalizing the mere wearing of a mask where it is intended that the mask will itself send a message which is intimidating or threatening to another person. Such an application of subsection (c) is problematic because it infringes on the communication of ideas which are constitutionally protected, albeit unpopular and offensive. We conclude, therefore, that § 733.05(c) is capable of interpretations which substantially impact on protected forms of speech. In this respect, the provision is overbroad on its face.

We also conclude that subsection (c) is unconstitutionally vague. Because the provision does not define the terms "intimidate," "threaten," "abuse," or "harass," the speaker is not given adequate notice as to what forms of potentially legitimate speech—including symbolic speech—may run afoul of the Ordinance. To some extent, the speaker's liability is potentially defined by the reaction or sensibilities of the listener; what is "intimidating or threatening" to one person may not be to another. And, although the provision has a scienter requirement, it is reasonable to expect that the requisite intent could be inferred from circumstantial factors, which may include the effect that particular speech has on the speaker's audience. From a law enforcement perspective, the difficulty in accurately applying subsection (c) is underscored by testimony which this Court received from Lieutenant Strickland of the Erie Police Department; Lieutenant Strickland represented that he was unsure how to apply the Ordinance in the context of the Klan's planned demonstration. Accordingly, we conclude that § 733.05(c) is unconstitutionally vague for two reasons: it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Morales*, 119 S.Ct. at 1859. We will grant Plaintiffs' request for permanent injunctive relief insofar as it concerns the enforcement of Article 733's restriction on public mask-wearing under § 733.05(c).

## III. CONCLUSION

Based upon the foregoing reasons, Plaintiffs' request for permanent injunctive relief will be granted in part and denied in part.

An appropriate order follows.

## *ORDER*

AND NOW, this ___ day of January, 2000, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiffs' request for a permanent injunction and declaratory judgment is GRANTED in part and DENIED in part as follows:

1. The Court finds that Article 733 of the Codified Ordinances of the City of Erie, § 733.05(c) is unconstitutional and orders that Defendant, the City of Erie, is permanently enjoined from enforcing the same; and

2. The Court finds that, in all other respects, Article 733 of the Codified Ordinances of the City of Erie is constitutional and, with respect to the same, no permanent injunction shall be issued.

The Clerk is hereby ordered to mark this case "CLOSED."